[No. D009328. Fourth Dist., Div. One. Aug. 3, 1989.]

LA JOLLA VILLAGE HOMEOWNERS' ASSOCIATION, INC., Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
QUALITY ROOFING, INC., et al., Real Parties in Interest.

1134

---

**COUNSEL**

Thorsnes, Bartolotta, McGuire & Padilla, John F. McGuire, Jr., and Cathy A. Richardson for Petitioner.

No appearance for Respondent.

Mower, Koeller & Nebeker, William A. Nebeker, Scott P. Cranny, Rose Marie Garner, David W. Brennan, Lynne Pearson, Detisch, Christensen & Wood, Donald W. Detisch, Charles B. Christensen, Stephen R. Mulligan, James M. Ledakis, David E. Hausfeld, Gade & Gade, Kevin T. Cauley, Gray, Cary, Ames & Frye, Marcelle E. Mihaila, Kenneth S. Klein, Richard W. McAlister, Portigal, Hammerton & Allen, Michael A. Portigal, Donna Bader, Leland & Lanigar, Michael Saydah, Bacalski, Holdway & Prindle,

Dan Bacalski, Glen S. Robinson, Margaret Byrne, Haasis, Pope & Correll, Denis Long and A. David Mongan for Real Parties in Interest.

---

## OPINION

HUFFMAN, J.—La Jolla Village Homeowners' Association, Inc. (Village) seeks mandate review of the superior court's order striking from its third amended complaint the second cause of action for strict liability and the sixth cause of action for nondisclosure, as to all subcontractors, respectively (real parties in interest, referred to hereafter collectively as Subcontractors), and its order granting the motions filed by Subcontractors for judgment on the pleadings without leave to amend as to those same causes of action. Village specifically requests we issue an order compelling the San Diego Superior Court to vacate that portion of its November 21, 1988, status conference order, filed December 2, 1988, and amended December 15, 1988, striking the second and sixth causes of action and granting judgment based on the pleadings of those two causes in favor of Subcontractors, and to enter a new order directing the superior court to 1) grant Village's motion to file the second and sixth causes of action of the third amended complaint as to Subcontractors, 2) deny Subcontractors' motions for judgment on the pleadings, and 3) grant such other relief as may be just and proper.

We shall conclude the trial court properly ruled as a matter of law Village could state no cause of action against Subcontractors for strict liability in tort and for nondisclosure of known building code violations. We therefore deny the writ.

### FACTUAL AND PROCEDURAL BACKGROUND

Village represents the owners of La Jolla Village Southpointe (Southpointe), a project comprised of 419 condominium units. In this capacity, on November 21, 1984, Village filed an action to recover damages for numerous alleged construction defects and land subsidence at Southpointe. The complaint contained causes of action for negligence, nuisance, strict liability, and breach of warranty against the developer of Southpointe, Donald L. Bren Company et al. (Bren), and numerous Doe defendants.

Village amended the complaint twice, once in March 1986 and again in November of 1987, to name as Doe defendants the design professionals and engineers and the subcontractors involved in "constructing and manufac-

turing" the alleged defective chimneys, retaining walls, roofs, concrete and tile stairways, building pads and drainage systems.

Sometime in 1987, pursuant to San Diego Superior Court local rules, the lawsuit was designated as complex litigation and assigned for all purposes to the Honorable Jack R. Levitt. After Judge Levitt retired, the case was reassigned to the Honorable Benjamin W. Hamrick.

On August 3, 1988, Village filed a notice of motion and motion for leave to file a third amended complaint. The proposed third amended complaint eliminated the nuisance cause of action, added a fifth and seventh cause of action against Bren only for fraud and deceit and breach of fiduciary duty, respectively, and added a sixth cause of action for nondisclosure (fraudulent concealment) against Bren and Subcontractors: C. E. Rodgers Masonry Contractor, Inc., doing business as Rodgers Masonry (Rodgers); Tailored Construction, Inc. (Tailored); Certified Roofers, Inc., doing business as Coast Roofing (Coast); Quality Roofing, Inc., doing business as Xeric Corporation, now known as Hess Roofing, Inc. (Hess); and Scott Roofing Company (Scott). The proposed complaint also added to the second cause of action for strict liability new language as the basis of recovery against Bren and certain Subcontractors: Rodgers; Tailored; Coast; Hess; Scott; Ferrell, Signs & Pinnick, Inc., now known as Signs & Pinnick, Inc. (Signs); Ruhm Tile & Marble, Inc. (Ruhm); Cass Construction, Inc. (Cass); Donald Pollock Excavating, Inc. (Pollock); Ben E. Smith, Inc. (Smith); Western Tile Company (Western); K-Tile Company, doing business as San Diego Tile Company (K-Tile): S & H Framing, Inc. (S&H); R. E. Hazard Contracting Company (Hazard); Rancho Landscape Company (Rancho); Nalco Plumbing & Heating Co. (Nalco); and James B. Coles, Inc. (Coles).

Subcontractors Rodgers, Scott, Hess, Smith, Coast, S&H, and Tailored, as well as several other defendants and cross-defendants not parties to this petition, filed oppositions or joinders in opposition to the motion to amend the complaint. Then in October 1988 Tailored filed a motion for judgment on the pleadings as to the second cause of action of the proposed third amended complaint or alternatively as to the corresponding strict liability cause of action in the second amended complaint. Subcontractors Scott, Hess, Signs, Pollock, Western, Cass, Rodgers, Ruhm, K-Tile, S&H, Smith and Coast followed suit by filing additional motions or joinders in the motion for judgment on the pleadings. Village opposed these motions.

The motions for judgment on the pleadings and the motion to amend, along with other motions not pertinent here, were set for hearing at 10 a.m. on November 21, 1988. At that time, Judge Hamrick stated: "As Judge

Whopner [*sic*] would say, I have read your complaints and the responses, I am prepared to make rulings on the motions, unless counsel wants to argue the matters." After asking everyone if they were willing to submit the matters of concern here, and receiving no objections, Judge Hamrick ruled: "Then as far as the motion by the plaintiff [Village] to file a third amended complaint, I am going to grant that motion with the following proviso: the second cause of action for strict liability will be disallowed and stricken. Because I don't believe the strict liability extends to the subcontractors for performing services as opposed to a component product.

"· · · · · · · · · · · · · · · · · ·

"And I would limit the sixth cause of action regarding nondisclosure to defendant Bren only. There is no duty imposed on the subcontractors to disclose to unknown purchasers, and there is no allegation of any conspiracy.

"So with those limitations I would grant the motion to amend—file an amended complaint."

Asked for clarification, Judge Hamrick stated he meant to say the second cause of action was stricken only as to the subcontractors and then gave his tentative ruling granting the motions for judgment on the pleadings as to the strict liability cause of action. After discussion of other matters, Village sought further clarification on the court's rulings on the motions.

The court stated it was granting the motion to amend with certain limitations first and then reaching the issue of the judgment on the pleadings motions so as to have them address the third amended complaint; the judgment on the pleadings motions were granted as to all subcontractors without leave to amend.[1] The court also stated it had stricken the nondisclosure cause of action from the proposed, and now filed, third amended complaint without leave to further amend. Gratuitously, Judge Hamrick added that while his ruling affected only those defendants, Subcontractors, who brought the motions, his feeling was "that there is no strict liability on the part of the subcontractors who furnished primarily services as opposed to a component part like a furnace or something of that nature." After discussing additional status matters, the court rescheduled the April 1989 trial date for September 11, 1989.

On December 2, 1988, a written order embodying the court's rulings and titled Status Conference Order of November 21, 1988, was filed. That order

---

[1] Several of the Subcontractors challenged the sufficiency of the second amended complaint as well as the third amended complaint. The court properly treated all motions as addressing the newly filed third amended complaint.

provides in pertinent part: "1. Plaintiff's motion for leave to file a *third* amended complaint is granted with the following exceptions:

"a) The second cause of action alleging strict liability is limited to Bren Company only and is disallowed and stricken as against any subcontractors;

". . . . . . . . . . . . . . . . . . . . ."

"c) The sixth cause of action for nondisclosure is allowed as to the general contractor Bren Company only and is disallowed and stricken as to all subcontractors.

"2. The motions for judgment on the pleadings filed by subcontractors Hess Roofing, Coast Roofing, Ruhm Title & Marble, Cass Construction, K-Tile, Scott Roofing, Pollock Excavating, Rodgers Masonry, S & H Framing, Signs & Pinnick, Ben Smith, Tailored Construction and Western Tile Company are granted without leave to amend consistent with the Court's ruling above on the plaintiff's motion to file a third amended complaint." An amended order was subsequently filed December 15, 1988, to accurately reflect Bren and its joint venture relationships as defendants in the order.[2]

On January 10, 1989, Village filed this instant petition for writ of mandate challenging the trial court's rulings included in these orders and naming the 13 Subcontractors who brought motions for judgment on the pleadings as the Real Parties in Interest; Bren is not named as a party to these proceedings. We issued an order to show cause why the relief prayed for in Village's petition should not be granted. Of the 13 Subcontractors, only Coast and K-Tile failed to file responses. Two of the Subcontractors, Western and Tailored, included with their responses demurrers to Village's petition on the grounds of failure to state sufficient facts entitling it to a cause of action for strict liability or to state facts demonstrating it has no adequate remedy at law.[3] The gist of the Subcontractors' responses is that actions for strict liability and nondisclosure will not lie as against them. The issues are thus framed.

[2] The amended order added the following lines in place of "Bren Company" in 1. a) and c) of the original order: "[T]he entire joint venture consisting of the following: La Jolla Village, a joint venture composed of [Bren], a California corporation and Land Inns, Inc., a corporation formerly known as La Jolla Village, Inc., a California corporation and as Viljo Corporation, a California Corporation; [Bren], a California corporation; and Land Inns, Inc., a California corporation . . . ."

[3] We summarily overrule these demurrers as the petition is well pled and adequately presents the legal issues arising from these facts. (Code Civ. Proc., § 1089; Cal. Rules of Court, rule 56(e).)

All future statutory references are to the Code of Civil Procedure unless otherwise specified. When referring to statutory subparts we omit repetition of the word "subdivision."

## Discussion

Village contends the trial court's rulings are contrary to law and, consequently, the trial court erred in striking the causes of action for strict liability and nondisclosure without leave to amend and in granting motions for judgment on those pleadings without leave to amend.

In support of these contentions, Village posits the following arguments: (1) Because the theory of strict liability has expanded in California to include a real property development as a product and the developer of that property as a manufacturer, "subcontractors who fashion raw materials into substantial, determinable and defective components of a real estate product must also be held strictly liable for defects in those components." (Italics deleted.) (2) Since the trial court failed to recognize this extension of the strict liability theory of tort law, its ruling Village could not as a matter of law state a cause of action against subcontractors was erroneous.

In addition, Village claims the court's ruling no cause of action for nondisclosure could be stated against the subcontractors was in error because the court ignored established law that "a party who has knowledge of material facts which are known or accessible only to that party, or where the party conceals those facts, has a duty to disclose even in the absence of privity or a confidential relationship." (Italics deleted.)

### A

### Standards of Review

■ Before separately addressing Village's arguments, we note that orders dealing with pleadings are largely discretionary and interlocutory in nature. Because they are seldom appealable until final judgment in the case, mandamus review will normally lie to control judicial discretion when that discretion has been abused. (*State Farm etc. Ins. Co.* v. *Superior Court* (1956) 47 Cal.2d 428, 433 [304 P.2d 13].) This is especially so where, as here, the resolution of the pleading problem is in the interests of judicial economy, the legal questions involved are of statewide importance, the matter has been fully briefed and there is little consistency in rulings on the issues in the trial courts. ■ We thus consider de novo whether the trial court, in striking the second and sixth causes of action in the third amended complaint and in granting Subcontractors' motions for judgment on the pleadings, all without leave to amend, "has made a ruling which deprives [Village] of the opportunity to plead [a] cause of action"; in such case it has abused its discretion. (*Holtz* v. *Superior Court* (1970) 3 Cal.3d 296, 301, fn.

4 [90 Cal.Rptr. 345, 475 P.2d 441]; *Trindade* v. *Superior Court* (1973) 29 Cal.App.3d 857, 859 [106 Cal.Rptr. 48]; *Daum* v. *Superior Court* (1964) 228 Cal.App.2d 283, 286 [39 Cal.Rptr. 443].)

■ Generally, a motion for judgment on the pleadings, like a general demurrer, tests whether, as a matter of law, a pleading states facts sufficient to constitute a cause of action. (*Banerian* v. *O'Malley* (1974) 42 Cal.App.3d 604, 611 [116 Cal.Rptr. 919].) For purposes of review, the material facts alleged in the complaint and facts that may be implied or inferred from those expressly alleged are usually treated as true (*Gruenberg* v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 572 [108 Cal.Rptr. 480, 510 P.2d 1032]), and we determine whether the trial court erred when it decided the plaintiff failed to state a cause of action as a matter of law. (*Banerian* v. *O'Malley, supra,* 42 Cal.App.3d at p. 611.) Moreover, as with a demurrer sustained without leave to amend, a judgment on the pleadings without leave to amend should not be granted if there is a reasonable possibility that a defect in the complaint can be cured by amendment. (*Minsky* v. *City of Los Angeles* (1974) 11 Cal.3d 113, 118 [113 Cal.Rptr. 102, 520 P.2d 726].) However, leave to amend should be denied where no liability exists under substantive law. (See *Heckendorn* v. *City of San Marino* (1986) 42 Cal.3d 481, 489 [113 Cal.Rptr. 102, 520 P.2d 726].) The burden of proving there is a reasonable possibility the defect can be cured by amendment is on the plaintiff. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].)

■ Further, section 473 authorizes the trial court, in its discretion, to allow or deny amendments "in the furtherance of justice." While amendments are generally liberally construed, the failure of a proposed amendment to state facts sufficient to constitute a cause of action may support an order denying a motion to amend. (*California Casualty Gen. Ins. Co.* v. *Superior Court* (1985) 173 Cal.App.3d 274, 280 [218 Cal.Rptr. 817].) In addition, the trial court is authorized in its own discretion under section 436 to strike from a pleading "any irrelevant, false, or improper matter." (§ 436(a).)

We now turn to the second and sixth causes of action of Village's third amended complaint and determine whether the court properly struck those causes of action as to Subcontractors and properly granted their judgments on the pleadings without leave to amend. In other words, we must decide whether the court correctly found as a matter of law Village could not state causes of action against Subcontractors for strict liability and nondisclosure, respectively.

## B

### Strict Liability

■ The nature of an action based on strict products liability is that a person engaged in the business of manufacturing or selling products for use or consumption is strictly liable in tort where the person places the product on the market, knowing that it is to be used without inspection for defects, and a defective or dangerous condition of the product causes personal injuries, death or property damage to foreseeable users or consumers, or even a mere bystander. (*Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049]; see also 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 578, p. 617.) The purpose of such an action "is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (*Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57, 63.) "The doctrine of manufacturers' and suppliers' strict liability in tort was developed primarily to protect individual consumers, users, and, to some extent, bystanders who are in no position to protect themselves from defective products. [Citations.]" (*U. S. Financial* v. *Sullivan* (1974) 37 Cal.App.3d 5, 18 [112 Cal.Rptr. 18].) As noted by Justice Traynor in his concurring opinion in *Escola* v. *Coca Cola Bottling Co.* (1944) 24 Cal.2d 453, 462 [150 P.2d 436]: "[P]ublic policy demands that responsibility be fixed wherever it will most efficiently reduce the hazards to life and health inherent in defective products that reach the market. . . . The cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business." ■ The doctrine has thus been extended to apply not only to a manufacturer, but also to others in the commercial marketing chain. (*Becker* v. *IRM Corp.* (1985) 38 Cal.3d 454, 459 [213 Cal.Rptr. 213, 698 P.2d 116, 48 A.L.R.4th 601].)

■ In 1969, the doctrine of strict liability in California was first extended beyond the original context of manufactured products to residential developers. In *Kriegler* v. *Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224 [74 Cal.Rptr. 749], a Court of Appeal reviewed a case involving personal injuries to Kriegler, a homeowner, allegedly caused by a faulty radiant heating system installed in the home by a subcontractor before Kriegler purchased the house from the builder/developer Eichler. In determining there was no basis to distinguish a developer/seller of mass-produced homes from a manufacturer/seller of other products, the court stated: "[T]here are

no meaningful distinctions between Eichler's mass production and sale of homes and the mass production and sale of automobiles and that the pertinent overriding policy considerations are the same. . . .

" 'When a vendee buys a development house from an advertised model . . . he [or she] clearly relies on the skill of the developer and on its implied representation that the house will be erected in a reasonably workmanlike manner and will be reasonably fit for habitation. . . .

" 'Buyers of mass produced development homes are not on an equal footing with the builder vendors and are no more able to protect themselves in the deed than are automobile purchasers in a position to protect themselves in the bill of sale.' . . ." (269 Cal.App.2d at pp. 227-228.) Thus, a homeowner may proceed under the theory of strict liability against a developer who mass-produces and sells tract homes. (*Ibid.*)

Based upon *Kriegler,* numerous cases further extended the doctrine of strict liability for defects in real property developments to builders, sellers or lessors. *Avner* v. *Longridge Estates* (1969) 272 Cal.App.2d 607, 615 [77 Cal.Rptr. 633] held the "manufacturer[/developer] of a lot may be held strictly liable in tort for damages suffered by the owner as a proximate result of any defects in the manufacturing process." *Stuart* v. *Crestview Mut. Water Co.* (1973) 34 Cal.App.3d 802, 811 [110 Cal.Rptr. 543] held a developer may also be held strictly liable for property damage caused by a defective water distribution system it installs, although the system was not installed on the plaintiffs' properties. *Hyman* v. *Gordon* (1973) 35 Cal.App.3d 769, 772-773 [111 Cal.Rptr. 262] held a homebuilder may be held strictly liable "where, as the proximate result of a defect in the design of a residential building, and installation of an article pursuant thereto, injury results to a human being." (*Id.* at p. 773.) In *Golden* v. *Conway* (1976) 55 Cal.App.3d 948, 961-962 [128 Cal.Rptr. 69], the court held "a lessor of real property who . . . is engaged in the business of leasing apartments and appurtenant commercial premises, equips the premises with an [article] without knowing whether . . . it is defective because of the manner in which it was manufactured or installed, and it proves to have defects which cause injury to persons or property when used in a normal manner, is strictly liable in tort." And, in *Del Mar Beach Club Owners Assn.* v. *Imperial Contracting Co.* (1981) 123 Cal.App.3d 898 [176 Cal.Rptr. 886, 25 A.L.R.4th 336], we extended the doctrine to the developer of a "multiple-unit, residential, planned development complex" which was located on an unstable bluff resulting in property damage to the various units. (*Id.* at pp. 911-913.)

An overview of these cases reflects that the doctrine of strict liability has been applied to defendants who are characterized as mass producers, developers and sellers/lessors of real property developments and extended no further. No reported California case has held that a subcontractor hired by a developer can be held strictly liable for defects in a mass-produced housing project[4] and we decline to do so now.

 Village's argument for expanding the doctrine to the Subcontractors is that it would spread the cost of a plaintiff's typically economic damages. While the principle of risk distribution has been described as the fundamental policy underlying the doctrine of strict liability (*Price* v. *Shell Oil Co.* (1970) 2 Cal.3d 245, 251 [85 Cal.Rptr. 178, 466 P.2d 722]), a plaintiff is already protected because the developer is strictly liable for the negligence of its subcontractors and the developer has adequate recourse to proceed against the subcontractors if warranted in any particular case.

In the typical general contractor/developer-subcontractor relationship, the general is the principal in charge of the planning, designing, constructing, supervising, inspecting and then selling of the residential units. The general hires subcontractors to carry out the planning, designing, and constructing of the units. Normally, numerous subcontractors will be retained by the general to assist on the project before the residential units are finished products ready for mass consumption. The subcontractors usually follow set plans and specifications given to them by the general contractor to do a particular job or "component part" in the "manufacturing of the product" and leave the project when that job is completed and approved by the general. The subcontractor customarily performs one task which is integrated into a whole. It does not control the trades which precede or follow it on the job. For example, the subcontractor who lays tile in an entryway has no choice but to accept the cement slab or the wooden footing which has previously been installed by other subcontractors, and it cannot control the stucco applicator who comes on the project after it leaves the project. Hence the subcontractor does not have control over the whole "product" nor over its own "component part" except as to dealings with its own work within the limits placed on it by its contract with the general contractor. It does not typically construct a finished product to its own

---

[4] Village asks us to take judicial notice of our unpublished decision in *Christiana Community Builders* v. *the San Diego Superior Court/A.A. Baxter Corporation* (Sept. 16, 1988) D007100 for the proposition we have already held subcontractors strictly liable for defects in a real property project. *Christiana,* however, considered the issue of whether the developer there had adequately pleaded a cause of action against a subcontractor for equitable indemnity based upon strict liability at the demurrer stage. Because that opinion is not published and we did not deal with parties and pleadings in the same posture as we have here, we do not construe *Christiana* as determining the issues we now address.

specifications (like a tire made for an automobile), but works to the plans of the developer.

Because of these distinctions, the developer usually is the best capitalized and most likely insured of the various entities involved in home construction. The subcontractor is typically a smaller entity, with less capital and less insurance. The developer is also normally in privity with the homeowner plaintiff and thus the most readily available source of compensation.

By precluding actions in strict liability against subcontractors we do not restrict the spread of liability to those culpable; imposition of liability is still available against the subcontractor based upon the conventional theories of breach of contract, warranty or negligence. If the alleged construction defect results from the fault of a subcontractor, the developer is in the best position to join that entity in the lawsuit by cross-complaint. Code of Civil Procedure section 337.15, subdivision (c) provides that a cross-complaint for indemnity may be filed by a developer against a subcontractor at any time within a 10-year statutory period, even though a direct action by a homeowner may be time-barred. (*Valley Circle Estates* v. *VTN Consolidated, Inc.* (1983) 33 Cal.3d 604 [189 Cal.Rptr. 871, 659 P.2d 1160].)

In the related area of strict liability for injuries caused by defective conditions on the land, our Supreme Court has "placed major importance on the existence of possession and control as a basis for tortious liability for conditions on the land" (*Preston* v. *Goldman* (1986) 42 Cal.3d 108, 119 [227 Cal.Rptr. 817, 720 P.2d 476]) and has noted that "the right of supervision and control 'goes to the very heart of the ascription of tortious responsibility . . .' [citation.]." (*Sprecher* v. *Adamson Companies* (1981) 30 Cal.3d 358, 369 [178 Cal.Rptr. 783, 636 P.2d 1121].) Consequently, "[a] defendant cannot be held liable for the defective or dangerous condition of property which it did not own, possess, or control." (*Isaacs* v. *Huntington Memorial Hospital* (1985) 38 Cal.3d 112, 134 [211 Cal.Rptr. 356, 695 P.2d 653].) Similarly, a subcontractor who does not have any ownership or control over the project or over its portion of the project being built should not be held strictly liable for defective or dangerous conditions of the mass-produced homes.

Recognizing the distinctions between a developer and a subcontractor places the liability for defects in construction where the responsibility and spoils lay. Moreover, the realities of the real estate construction/development business weigh heavily in deciding against an extension of strict liability to subcontractors. To extend the doctrine to the subcontractors would seriously impact that industry and the home-buying public. The

additional costs to the subcontractor for insurance premiums for the newly created exposure would be passed on to developers who in turn would pass the costs on to the consumer, resulting in higher housing costs. We decline to extend the doctrine to persons who have no control over or financial interest in, other than for their own payment for services, the project or product being "manufactured."

Our holding is supported by the reported cases dealing with "subcontractors" and strict liability. While these cases have generally distinguished "subcontractors" from builders/developers as providers of services who were only liable for their own negligence or intentional acts, their reasoning conveys a broader reach to include all subcontractors in the typical real estate construction project regardless of whether they provided "services" or a "product."

As early as 1954, our Supreme Court in *Gagne* v. *Bertran* (1954) 43 Cal.2d 481 [275 P.2d 15] refused to hold a test-hole driller liable for strict liability of warranty for his improper assertions as to the amount of fill in a residential lot. In doing so it stated: "The evidence in the present case does not justify the imposition of the strict liability of a warranty. There was no express warranty agreement, and there is nothing in the evidence to indicate that defendant assumed responsibility for the accuracy of his statements. He did not . . . tender plaintiffs an 'absolute promise' that the results of his test would be accurate. He was not a seller of property who obligated himself as part of his bargain to convey property in the condition represented. The amount of his fee and the fact that he was paid by the hour also indicate that he was selling service and not insurance. Thus the general rule is applicable that those who sell their services for the guidance of others in their economic, financial, and personal affairs are not liable in the absence of negligence or intentional misconduct." (*Id.* at p. 487.)

In *Stuart* v. *Crestview Mut. Water Co., supra,* 34 Cal.App.3d 802, while holding the developer strictly liable, the court refused to hold the "subcontracting" engineers who designed the defective water system strictly liable. The court there stated: "We cannot . . . find any basis for holding the engineers on a strict liability theory. They rendered a professional service and are in no sense analogous to manufacturers who place products on the market and who are, therefore, in the best position to spread the cost of injuries resulting from defective products. [Citations.] . . . '[T]he well settled rule in California is that where the primary objective of a transaction is to obtain services, the doctrines of implied warranty and strict liability do not apply [citation]. . . .' " (*Id.* at p. 811.)

In *Swett* v. *Gribaldo, Jones & Associates* (1974) 40 Cal.App.3d 573 [115 Cal.Rptr. 99], the court reviewed the history of strict liability law as it relates to real property and concluded the decisions "strongly indicate that the producer-seller of tract houses, whether he is termed developer, subdivider, or builder, would be liable to plaintiff purchasers under a theory of strict liability." (*Id*. at p. 575.) It then followed the rationale of *Gagne* and *Stuart* to find that a soils engineering firm was not so liable to the purchaser of a home for damages resulting from instability of the soil which caused unrepairable cracks. (*Id*. at pp. 575-576.) The court in *Swett* stressed that the engineering firm had no interest in the property, did not participate in any way in its sale, and was paid by the hour. (*Id*. at p. 576.)

From these cases we glean that the subcontractor relationship and its corresponding responsibilities may be different depending upon the type of contract and status between the parties. While a subcontractor may also be the developer of a project or be in a joint venture having a financial interest in and control of the project, if such a special status or relationship applies, the subcontractor would not really be a subcontractor, regardless of its providing services to the project, and it could conceivably be treated as part of the manufacturing link. Such a special status or relationship, however, must be specifically pleaded before a strict liability cause of action can be stated against a subcontractor.

Thus the question remains whether Village has alleged a relationship against Subcontractors other than the normal subcontractor relationship for which a strict liability cause of action can be stated.

Village's third amended complaint alleges in the second cause of action for strict liability that: "[D]efendants sued in this cause of action were at all times engaged in the business of mass producing, developing, building and supplying condominium units and adjoining common areas or component parts thereof to the general public.

" . . . [And] that as part of its business, BREN and defendants sued in this cause of action developed, constructed, marketed and supplied, as component parts, the common areas and living units of the Project to [Village] as well as the improvements servicing said units." Village further alleges knowledge by the defendants that the units would be purchased without substantial inspection for "defects associated with soil conditions and/or subsurface drainage and/or adequate preparation and construction of improvements thereon"; that Village's members relied on the "supposed skill" of Bren and the defendants, that Bren and the defendant used substandard material, ignored standard practices in the business trade, deviated from the

approved building plans, violated existing codes, and the units were thus not fit for habitation and enjoyment when used in the manner intended. Moreover, Village alleges a variety of defects in the common areas, units and improvements "not limited to, roofs, stairways, pipes, streets, concrete work, framing systems, chimneys, and noise deterrent systems," and alleges Bren and defendants knew or should have known of these defects and failed to warn Village or its members. Village alleges continuing property damage to the common area and residential units.

Village, however, also incorporates by reference into the second cause of action the allegations of its introductory paragraphs of the third amended complaint and its first cause of action for negligence of the defendants. In those paragraphs are certain pertinent allegations concerning the relationships of the parties. In the eighth paragraph, Village alleges Bren was in a joint venture relationship at the commencement of the development of Southpointe "in order to develop and market the units and associated improvements within Phase A of the Project (Units 1-86). Thereafter, BREN assumed all rights and liabilities connected with the project and completed the development of Phases B, C and D."

Village then names all the Subcontractors as defendants in the lawsuit. In the 47th paragraph, Village throws in a general agency allegation concerning all the defendants. However, in the negligence cause of action Village specifically alleges each Subcontractor was retained by Bren for the purpose of manufacturing its respective "component part" of the project/product; i.e., Scott, Hess and Coast were retained to "manufacture" roofs; Signs and Pollock were retained to "manufacture" graded lots, graded building pads, road beds, finished streets, and parking lots; Cass was retained to "manufacture" improvements at the property consisting of sewers, water and storm drain systems; Tailored and Rodgers were retained to "manufacture" brick chimneys, fireplaces and retaining walls; Ruhm, Western, and K-Tile were retained to "manufacture" tile work at the exterior entries of certain units and at the project; S&H was retained to "manufacture" improvements to include structural, framing, including exterior walls, interior partitions, floor and roof joists, beams and roof framing; and Smith was retained to "manufacture" improvements including concrete foundations, slabs, concrete flatwork, concrete stairways, and related support systems.

Village then alleges that Bren "failed to properly supervise, plan, construct, inspect, design and/or develop the project" and "represented material facts and/or negligently failed to disclose material facts from plaintiff[/Village]."

When the trial court ruled on the motions for filing the third amended complaint and the motions for judgment on the pleadings, it had before it the second cause of action and all the incorporated paragraphs. It was the third and not the first amended complaint; it was more than three years down the road from the filing of the original complaint. While generally the relationship between the parties is a question of fact, the relationship between Bren and the other defendants as Subcontractors was specifically alleged in the opening paragraphs of the complaint and the negligence cause of action. The attempt by Village to stretch that relationship to an equal footing with Bren in the second cause of action by mere conclusory allegations was a matter well within the trial judge's intellect to detect and reject. While the court on a judgment on the pleadings takes the allegations as true, in light of other more specific "true" allegations incorporated into the second cause of action, the court could easily determine the contractor-subcontractor relationship here.

Moreover, because Village, by this time, had not more specifically pleaded a relationship other than the typical general contractor-subcontractor relationship, the court could logically infer such a relationship did not exist. Without such pleading, the face of this amended complaint shows the relationship between Bren and Subcontractors was the typical contractor-subcontractor relationship for which no strict liability will attach. That the trial judge struck the second cause of action as to the Subcontractors and granted the Subcontractors' motions for judgment on the pleadings without leave to amend was therefore a proper exercise of discretion.

### NONDISCLOSURE

Relying on *Warner Constr. Corp.* v. *City of Los Angeles* (1970) 2 Cal.3d 285 [85 Cal.Rptr. 444, 466 P.2d 996] and *Barnhouse* v. *City of Pinole* (1982) 133 Cal.App.3d 171, [183 Cal.Rptr. 881], Village also challenges the trial court's striking of the sixth cause of action for nondisclosure from the third amended complaint. We again find the trial court properly exercised its discretion.

In *Warner,* the City of Los Angeles contracted with Warner Construction Company (Warner) to have it build a retaining wall in that city. During construction of the wall, Warner encountered difficulties with the subsurface conditions which were different than those represented by the plans and specifications drawn by the city and relied upon by Warner when bidding on the contract. In finding a cause of action stated for nondisclosure of material facts, the appellate court in *Warner* stated: " 'It is the general rule that by failing to impart its knowledge of difficulties to be encountered

in a project, the owner will be liable for misrepresentation if the contractor is unable to perform according to the contract provisions.' [Citations.] . . . 'This rule is mainly based on the theory that the furnishing of misleading plans and specifications by the public body constitutes a breach of an implied warranty of their correctness. The fact that a breach is fraudulent does not make the rule inapplicable.' [Citations.]

"In transactions which do not involve fiduciary or confidential relations, a cause of action for non-disclosure of material facts may arise in at least three instances: (1) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead; (2) the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff; (3) the defendant actively conceals discovery from the plaintiff." (*Warner Constr. Corp.* v. *City of Los Angeles, supra,* 2 Cal.3d 285, 294, fns. omitted.)

*Warner,* however, concerned a case where a tort action was not allowed because of the city's immunity under Government Code section 818.8; the action was only allowed to proceed to jury trial on a contract action for fraudulent concealment. Thus the language in that case on which Village relies for the proposition a tort cause of action for nondisclosure can be stated against Subcontractors even without some privity, confidential or fiduciary relation is inapposite; rather that language establishes three instances where a contract cause of action for nondisclosure will apply without a confidential or fiduciary relationship.

Moreover, *Barnhouse* v. *City of Pinole, supra,* 133 Cal.App.3d 171, dealt with a real estate developer and noted that it was now settled California law " 'that where the seller knows of facts materially affecting the value or desirability of the property . . . and also knows that such facts are not known to, or within the reach of the diligent attention and observation of the buyer, the seller is under a duty to disclose them to the buyer. [Citations.]' [Citation.]" (*Id.* at pp. 187-188.) In holding the developer strictly liable there to a subpurchaser, the court in *Barnhouse* stated: "Although a developer does not know that there will be subpurchasers, it is foreseeable that there will be and that they will be the ones to suffer damage. The developer has every reason to expect that if there are subpurchasers, a nondisclosure about subsurface soil conditions will be passed on to them. Perhaps most important, the rule we announce does not extend the vendor's liability at all—it merely fails to reduce it. At the same time, without such a rule, the subpurchaser has no remedy because he or she can only turn to the vender with knowledge for recovery. [Citation.]" (*Id.* at p. 193, fn. omitted.)

*Barnhouse*'s holding is limited to transactions involving real property as between seller, buyers, developers, and real estate agents/brokers. (See *Easton* v. *Strassburger* (1984) 152 Cal.App.3d 90, 98, fn. 2 [199 Cal.Rptr. 383, 46 A.L.R.4th 521].)

The general rule for liability for nondisclosure is that even if material facts are known to one party and not the other, failure to disclose those facts is not actionable fraud unless there is some fiduciary or confidential relationship giving rise to a duty to disclose. (*Mesmer* v. *White* (1953) 121 Cal.App.2d 665, 670 [264 P.2d 60].) However, active concealment of facts and mere nondisclosure of facts may under certain circumstances be actionable without such a relationship. (See 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 697, pp. 799-800.)

For example, a duty to disclose may arise without a confidential or fiduciary relationship where the defendant, a real estate agent or broker, alone has knowledge of material facts which are not accessible to the plaintiff, a buyer of real property. (See *Rothstein* v. *Janss Investment Corp.* (1941) 45 Cal.App.2d 64, 68 [113 P.2d 465].) Depending on the transaction, though, a person who possesses knowledge of material facts may not have a duty to disclose. In *Heliotis* v. *Schuman* (1986) 181 Cal.App.3d 646, 649 [226 Cal.Rptr. 509], a buyer brought an action against the seller Schuman based on the failure to disclose facts of unstable soil. The buyer joined Schuman's attorney in the action, contending he owed the same duty to disclose material facts as a real estate broker would owe in the same situation. The court there held the attorney who represented Schuman and handled the details of the sale was not liable because he did not try to persuade the buyer to purchase the property and he did not interfere with the buyer's investigation of the property. (*Id.* at. p. 650.)

Civil Code section 1710 provides in relevant part, "[a] deceit . . . is either: . . . 3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; . . . ." To fasten liability under this section on a party alleged to be guilty of nondisclosure or fraudulent concealment of certain facts, it is necessary to show that the party was under a legal duty to disclose them. (*Lingsch* v. *Savage* (1963) 213 Cal.App.2d 729, 735 [29 Cal.Rptr. 201, 8 A.L.R.3d 537].) Such a duty may arise from a fiduciary or confidential relationship, privity of contract, or from special circumstances, oftentimes in cases dealing with the sale of property. (*Id.* at pp. 735-736.)

Generally, the elements of a fraud cause of action for damages based upon mere nondisclosure involving no fiduciary or confidential rela-

tionship are: "(1) Nondisclosure by the defendant of facts materially affecting the value or desirability of the property; (2) Defendant's knowledge of such facts and of their being unknown to or beyond the reach of the plaintiff; (3) Defendant's intention to induce action by the plaintiff; (4) Inducement of the plaintiff to act by reason of the nondisclosure and (5) Resulting damages. [Citations.]" (*Lingsch* v. *Savage, supra,* 213 Cal.App.2d 729, 738.)

Here the sixth cause of action against Subcontractors Rodgers, Tailored, Coast, Hess and Scott fails to specifically allege Subcontractors made representations to Village and did not disclose facts which materially qualified those facts disclosed or rendered that disclosure likely to mislead Village to rely upon to its detriment. It also fails to show that the facts were known or accessible only to the Subcontractors and show that Subcontractors owed a duty to Village. No cause of action for nondisclosure was thus successfully pled against Subcontractors, and the trial court was within its discretion at this stage to strike that portion of the cause of action for nondisclosure referring to Subcontractors without leave to amend. As with the strict liability cause of action, because Village could not, after more than three years of litigation, more specifically plead the relationships of Subcontractors so as to give rise to a duty on their part to disclose alleged defects to Village, no abuse of discretion is shown by the trial court finding such a relationship showing duty could not be pleaded.

### DISPOSITION

Village's petition for writ of mandate is denied.

Benke, Acting P. J., and Froehlich, J., concurred.