98 Cal.Rptr.2d 587 (2000)
82 Cal.App.4th 856
Filipina JIMENEZ et al. Petitioners,
v.
The SUPERIOR COURT of San Diego County, Respondent;
T.M. Cobb Company et al. Real Parties in Interest.
No. D034723.
Court of Appeal, Fourth District, Division One.
August 1, 2000.
Review Granted November 15, 2000.
*589 Eppsteiner & Associates, Stuart M. Eppsteiner, San Diego, and Neal A. Markowitz for Petitioners.
No appearance for Respondent.
Acker, Kowalick & Whipple and Brian F. Drazich as Amicus Curiae on behalf of Respondent.
McAtee & Harmeyer and Jeff G. Harmeyer, San Diego, for Real Party in Interest Viking Industries, Inc.
Horton & Ryan and William B. Sullivan, San Diego, for Real Party in Interest T.M. Cobb Company.
*588 McDONALD, J.
In this opinion we conclude manufacturers of defective windows installed in mass-produced homes may be subject to strict products liability. In reaching our conclusion, we disagree with the contrary holding in Casey v. Overhead Door Corp. (1999) 74 Cal.App.4th 112, 87 Cal.Rptr.2d 603 (Casey).
Petitioners Filipina and Nestor Jimenez (Plaintiffs) filed a petition for a peremptory writ of mandate and/or prohibition seeking reversal of the trial court's orders granting the summary adjudication motions of Real Parties in Interest T.M. Cobb Company (Cobb) and Viking Industries, Inc. (Viking, and together with Cobb, Defendants).[1] Plaintiffs contend the trial court erred by relying on Casey to conclude that as a matter of law Defendants, who manufactured allegedly defective windows installed in Plaintiffs' home, were not subject to strict products liability. We grant the petition.

FACTUAL AND PROCEDURAL BACKGROUND
Plaintiffs own a home in the Galleria subdivision of 82 single family homes in the Scripps Ranch area of San Diego. McMillin Scripps II (McMillin) apparently was the developer of the Galleria subdivision. McMillin also was the developer of the Renaissance subdivision of 86 single family homes in the Scripps Ranch area. McMillin entered into a contract with Minnoch Supply Co. (Minnoch) to supply and install windows and glass doors in at least some of the Renaissance homes. Cobb designed and manufactured aluminum frames, windows and glass doors installed by Minnoch. McMillin also apparently entered into a contract for the installation of windows manufactured by Viking in certain homes in the Galleria and Renaissance subdivisions.[2]
The windows installed in the Galleria and Renaissance homes leaked and caused damage to the homes. Plaintiffs, on behalf of themselves and other Galleria and Renaissance homeowners, filed a class action complaint against Defendants, Minnoch and Medallion, alleging causes of action for strict products liability and negligence. The complaint alleged Defendants, Minnoch and Medallion "designed, developed, manufactured, produced, supplied and placed into the stream of commerce the defective windows" and that the windows "failed due to defective design, development, *590 and manufacturing, causing property damage."[3]
Cobb filed a motion for summary adjudication on the strict products liability cause of action. Cobb argued Casey held that, absent a special relationship with the developer of the homes, a manufacturer of windows or other components installed in mass-produced homes as a matter of law has no strict products liability to the homeowner. Cobb submitted a separate statement of undisputed material facts in which it stated it did not have a special relationship or any agreement with McMillin.
Plaintiffs opposed Cobb's motion for summary adjudication, arguing that Casey was incorrectly decided and factually distinguishable. They argued Cobb, as a manufacturer of component parts of massproduced homes, placed defective windows in the stream of commerce and should be subject to strict products liability. They further argued triable issues of material fact existed that precluded summary adjudication. Plaintiffs submitted a separate statement of facts in which they stated that Cobb's windows were defectively designed and manufactured and "caused damage to other parts of the Plaintiffs['] homes, including stucco, insulation, framing, drywall, paint, wall coverings, floor coverings, baseboards, and other parts of the homes."
Viking apparently filed a motion to join in Cobb's motion for summary adjudication.
The trial court granted Cobb's motion for summary adjudication, stating:
"A component part supplier in a mass residential development cannot be held strictly liable for damage which is caused to the home absent some special type of relationship. Casey v. Overhead Door Corp.[, supra,] 74 Cal.App.4th 112, 119-120 [87 Cal.Rptr.2d 603] and La Jolla Village Homeowners['] [Assn.] v. Superior Court (1989) 212 Cal.App.3d 1131, 1142, 1144-[1146] [261 Cal.Rptr. 146]. It is undisputed that this case involves a mass[-]produced residential development.... It is also undisputed that there was no special relationship between [Cobb] and McMillin which would place additional responsibilities on [Cobb].... [Cobb] was responsible for the design and manufacturing of the windows at the Renaissance project.... Based on the recent law as set forth in Casey, [supra], [Plaintiffs] cannot as a matter of law hold [Cobb] responsible for the defective windows because [Cobb was] merely a component part manufacturer and this is not allowed when dealing in construction defect claims arising from a mass residential development."
The court denied Viking's joinder motion on the ground it was untimely filed and served.
The parties stipulated that the trial court's order granting Cobb's summary adjudication motion would apply also in favor of Viking. The parties further stipulated that Plaintiffs' period for filing a petition for class certification would be extended until 20 days after our decision on Plaintiffs' petition. The trial court issued an order approving the parties' stipulation, thereby in effect granting summary adjudication in favor of Viking.
Plaintiffs filed this petition; we issued an order to show cause why the relief requested in the petition should not be granted and heard oral argument.[4]

DISCUSSION

I

Summary Adjudication Standard of Review
The purpose of a motion for summary judgment or summary adjudication is "to *591 discover whether the parties possess evidence requiring the fact-weighing procedures of a trial. [Citations.]" (Appalachian Ins. Co. v. McDonnell Douglas Corp. (1989) 214 Cal.App.3d 1, 10, 262 Cal. Rptr. 716.) Code of Civil Procedure section 437c, subdivision (f)(1)[5] provides: "A party may move for summary adjudication as to one or more causes of action within an action ... if that party contends that the cause of action has no merit.... A motion for summary adjudication shall be granted only if it completely disposes of a cause of action...." The moving party may show a cause of action has no merit by negating an essential element or by establishing a complete defense to that cause of action. (Toigo v. Town of Ross (1998) 70 Cal.App.4th 309, 324, 82 Cal. Rptr.2d 649; City of Emeryville v. Superior Court (1991) 2 Cal.App.4th 21, 23-25, 2 Cal.Rptr.2d 826.) "A motion for summary adjudication proceeds in all procedural respects as a motion for summary judgment." (Toigo, supra, at p. 324, 82 Cal. Rptr.2d 649; Lunardi v. Great-West Life Assurance Co. (1995) 37 Cal.App.4th 807, 819, 44 Cal.Rptr.2d 56; Westlye v. Look Sports, Inc. (1993) 17 Cal.App.4th 1715, 1727, 22 Cal.Rptr.2d 781.) As an appellate court, we conduct a de novo review to determine whether there are any triable issues of material fact that preclude summary adjudication. (Lunardi, supra, at p. 819, 44 Cal.Rptr.2d 56; Westlye, supra, at p. 1727, 22 Cal.Rptr.2d 781; Appalachian Ins. Co., supra, at p. 11, 262 Cal.Rptr. 716.) An appellate court "make[s] its own independent determination of the construction and effect of the papers submitted [citation], and the validity of the ruling is reviewable irrespective of the reasons stated. [Citation.]" (Preis v. American Indemnity Co. (1990) 220 Cal.App.3d 752, 757, 269 Cal.Rptr. 617.)

II

Strict Products Liability Generally
California first adopted the doctrine of strict products liability in Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57, which stated at pages 62 and 63, 27 Cal.Rptr. 697, 377 P.2d 897: "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being.... [¶] ... [¶] ... The purpose of such liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves."
The doctrine of strict products liability applies to all persons in the chain of distribution of a defective product, including manufacturers, wholesalers, and retailers. (Soule v. General Motors Corp. (1994) 8 Cal.4th 548, 560, 34 Cal.Rptr.2d 607, 882 P.2d 298; Bay Summit Community Assn. v. Shell Oil Co. (1996) 51 Cal. App.4th 762, 773, 59 Cal.Rptr.2d 322.) In Vandermark v. Ford Motor Co. (1964) 61 Cal.2d 256, at pages 262-263, 37 Cal.Rptr. 896, 391 P.2d 168, the court applied the doctrine of strict products liability to a retailer, stating: "Strict liability' on the manufacturer and retailer alike affords maximum protection to the injured plaintiff and works no injustice to the defendants, for they can adjust the costs of such protection between them in the course of their continuing business relationship." Strict products liability may also apply to persons who are not directly in the vertical chain of distribution of a defective product, but who "play an integral role in the `producing and marketing enterprise' of a defective product and profit from placing the product into the stream of commerce. [Citations.]" (Bay Summit Community Assn., supra, at p. 773, 59 Cal.Rptr.2d 322.) "Unlike negligence, in which the focus is on the conduct of the tortfeasor, strict liability focuses on the product itself and holds the manufacturer, et al., liable if *592 the product is defective. [Citation.]" (Edwards v. A.L. Lease & Co. (1996) 46 Cal. App.4th 1029, 1034, 54 Cal.Rptr.2d 259.)
Kriegler v. Eichler Homes, Inc. (1969) 269 Cal.App.2d 224, 227-229, 74 Cal.Rptr. 749, extended the doctrine of strict products liability to developers of mass-produced homes. Kriegler reasoned: "[T]here are no meaningful distinctions between Eichler's mass production and sale of homes and the mass production and sale of automobiles and ... the pertinent overriding policy considerations are the same." (Id. at p. 227, 74 Cal.Rptr. 749; Del Mar Beach Club Owners Assn. v. Imperial Contracting Co. (1981) 123 Cal.App.3d 898, 911-913, 176 Cal.Rptr. 886.)[6]
Strict products liability applies to both product design and manufacturing defects.[7] (Ferrari v. Grand Canyon Dories (1995) 32 Cal.App.4th 248, 257, 38 Cal.Rptr.2d 65; Barker v. Lull Engineering Co. (1978) 20 Cal.3d 413, 426, 143 Cal.Rptr. 225, 573 P.2d 443; Rest.3d Torts, Products Liability, § 2.) Although the doctrine applies to defective products, it does not apply to defective services. (Hyland Therapeutics v. Superior Court (1985) 175 Cal.App.3d 509, 513, 220 Cal. Rptr. 590; Endicott v. Nissan Motor Corp. (1977) 73 Cal.App.3d 917, 930, 141 Cal. Rptr. 95; Rest.3d, supra, § 19.) "Courts have not extended the doctrine of strict liability to transactions whose primary objective is obtaining services. [Citations.] Courts have also declined to apply strict liability where the transaction's service aspect predominates and any product sale is merely incidental to the provision of the service. [Citation.]" (Pierson v. Sharp Memorial Hospital, Inc. (1989) 216 Cal. App.3d 340, 344, 264 Cal.Rptr. 673.) In Pierson, we stated: "A product is a physical article which results from a manufacturing process and is ultimately delivered to a consumer."[8] (Id. at p. 345, 264 Cal. Rptr. 673, italics added.) The Restatement Third of Torts, Products Liability, section 19, subdivision (a) defines the term product for purposes of strict products liability: "A product is tangible personal property distributed commercially for use or consumption. Other items, such as real property and electricity, are products when the context of their distribution and use is sufficiently analogous to the distribution and use of tangible personal property that it is appropriate to apply the rules stated in this Restatement."[9]

III

Strict Products Liability of Component Manufacturers Generally
A manufacturer of a component that is subsequently installed in or otherwise *593 integrated as part of a larger product may be subject to strict products liability if that component was defective at the time it left the manufacturer's possession. (Wiler v. Firestone Tire & Rubber Co. (1979) 95 Cal.App.3d 621, 629, 157 Cal.Rptr. 248; 20 Wilkinson & Barker, Cal. Practice (1991) Tort Law, § 34.18, p. 78.) The Restatement Third of Torts, Products Liability, section 5 states: "One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if: [¶] (a) the component is defective in itself, as defined in this Chapter, and the defect causes the harm; or [¶] (b)(1) the seller or distributor of the component substantially participates in the integration of the component into the design of the product; and [¶] (2) the integration of the component causes the product to be defective, as defined in this Chapter; and [¶] (3) the defect in the product causes the harm." (Italics added.) A component therefore can be a product within another larger product and strict products liability can be imposed on the manufacturers and distributors of both products if the component product was defective when it left the component manufacturer's possession and the defect caused harm to a person or other property. The Restatement Third, supra, section 19, comment b, page 268 states: "Component parts are products, whether sold or distributed separately or assembled with other component parts. An assemblage of component parts is also, itself, a product." The Restatements reporters noted: "[T]he courts are in agreement that component parts should be considered products for the purposes of strict products liability. Thus, when a defective component is incorporated into something larger, the supplier or manufacturer of the component may be held strictly liable in tort for any damages proximately caused by the defect. [Citations.]" (Rest.3d, supra, § 19, reporters' notes, p. 273.)
California courts have upheld, expressly and implicitly, the application of the doctrine of strict products liability to manufacturers of defective component products. (Barth v. B.F. Goodrich Tire Co. (1968) 265 Cal.App.2d 228, 248, 71 Cal.Rptr. 306 [upheld a jury verdict imposing strict products liability on the manufacturer of a defective tire when the tire failed and caused the car on which it was mounted to turn over, resulting in the death of the driver and personal injuries to the other occupants]; Wright v. Stang Manufacturing Co., supra, 54 Cal.App.4th at pp. 1229, 1233-1234, 63 Cal.Rptr.2d 422 [court rejected the manufacturer's contention that "as a component part manufacturer it is not liable for a failure to warn when the final product is subsequently packaged, labeled and marketed by another manufacturer"];[10]Jenkins v. T & N PLC (1996) 45 Cal.App.4th 1224, 1228-1229, 1231, 53 Cal. Rptr.2d 642 [court held: "As a matter of law, a bulk supplier of raw asbestos fiber incorporated into a finished product can be subject to strict products liability to an individual suffering from a disease caused by exposure to the supplier's asbestos"; the component raw asbestos fibers that were incorporated into pipe insulation constituted a "product" for purposes of strict products liability]; Arena v. Owens-Corning Fiberglas Corp. (1998) 63 Cal.App.4th 1178, 1181-1191, 74 Cal.Rptr.2d 580 [court concluded suppliers of raw asbestos, a component in pipe insulation, were subject to strict products liability because the asbestos *594 was defectively designed]; Springmeyer v. Ford Motor Co. (1998) 60 Cal. App.4th 1541, 1550-1555, 71 Cal.Rptr.2d 190 [court upheld the strict products liability of the manufacturer of a fan, which was a component of a truck, for personal injuries caused by the defectively designed fan]; Southern Pac. Co. v. Unarco Industries, Inc. (1974) 42 Cal.App.3d 142, 151, 116 Cal.Rptr. 847 [court implicitly upheld the strict products liability of the supplier of a defective door that was a component of a railway freight car].)
In Peterson v. Superior Court (1995) 10 Cal.4th 1185, 1188-1189, 43 Cal.Rptr.2d 836, 899 P.2d 905, the California Supreme Court overruled its earlier decision in Becker v. IRM Corp. (1985) 38 Cal.3d 454, 213 Cal.Rptr. 213, 698 P.2d 116 and held that landlords and hotel owners are not subject to strict products liability for injuries to their tenants and guests that are caused by a defect in the premises.[11] In Peterson a hotel guest was injured when she slipped and fell in a bathtub that was installed as a component of the hotel. (Peterson, supra, at p. 1189, 43 Cal.Rptr.2d 836, 899 P.2d 905.) The guest alleged a strict products liability cause of action against the manufacturer of the bathtub and the hotel owner. (Ibid.) Before trial the bathtub manufacturer entered into a settlement agreement with the guest. (Ibid.) In holding that the hotel owner was not subject to strict products liability, the court noted that it would be improper to hold the hotel owner strictly liable for a defective bathtub that it did not create or market. (Id. at pp. 1188, 1199, 43 Cal. Rptr.2d 836, 899 P.2d 905.) The court stated: "[A] hotel owner is not a part of the chain of distribution of a bathtub that is installed in a hotel room, just as a restaurant owner is not the equivalent of a retailer of toilets simply because the restaurant provides restroom facilities to its patrons, and just as an owner of a business is not the equivalent of a retailer of ceiling fans simply because one is installed on the premises to promote the comfort of customers of the business. In such circumstances, the bathtub, toilets, and ceiling fans left the stream of commerce when they were purchased and installed in the premises of the various businesses." (Id. at p. 1199, 43 Cal.Rptr.2d 836, 899 P.2d 905.) Although the court concluded landlords and hotel owners are not subject to strict products liability, it expressly noted that the manufacturer of a defective component product, like the slippery bathtub, would be subject to strict products liability. (Id. at p. 1210, 43 Cal.Rptr.2d 836, 899 P.2d 905.) The court stated: "[T]he injured tenant or guest [is not] deprived of any strict products liability cause of action that may lie against the manufacturer, distributor, or retailer of a defective product that causes the injury." (Ibid.) Peterson therefore implicitly acknowledged that the manufacturer of a defective product that is installed as a component part of a larger product is subject to strict products liability.

IV

Application of Strict Products Liability to Defendants as Manufacturers of Component Products
Plaintiffs contend Defendants, as manufacturers of the windows installed in their homes, are manufacturers of products subject to the doctrine of strict products liability; the fact that these products were subsequently installed as component parts of mass-produced homes does not *595 change their character as products subject to imposition of strict products liability.

A
For purposes of strict products liability, the word products generally means tangible personal property that is distributed commercially for use or consumption. (Rest.3d Torts, Products Liability, § 19.) Products include component parts, "whether sold or distributed separately or assembled with other component parts." (Rest.3d, supra, § 19, com. b, p. 268.) A component part retains its classification as a product even though it is assembled or integrated with other component parts to form a larger product. (Rest.3d, supra, § 19, com. b, p. 268.)
Defendants do not dispute that their windows are mass-produced at their factories. When Defendants' manufactured windows leave the factories, they are tangible personal property and are commercially distributed by Defendants for use or consumption. Although Defendants' windows are intended to be installed in and become component parts of the larger product of homes and other buildings, their incorporation as component parts in a larger product does not change their status as products. Furthermore, the fact that windows are installed in and became fixtures to or otherwise part of real property does not change their status from products to real property. The Restatement Third of Torts, Products Liability, section 19, comment e, pages 270-271 states: "When a building contractor sells a building that contains a variety of appliances or other manufactured equipment, the builder, together with the equipment manufacturer and other distributors, are held as product sellers with respect to such equipment notwithstanding the fact that the built-in equipment may have become, for other legal purposes, attachments to and thus part of the underlying real property." (Italics added.) For purposes of strict products liability, manufactured windows installed as component parts of homes are no different from manufactured appliances or other equipment installed as component parts of homes.
In Golden v. Conway (1976) 55 Cal. App.3d 948, 951, 964, 128 Cal.Rptr. 69, the court reversed a directed verdict against a tenant who suffered personal property damage from a fire allegedly caused by a defective wall heater the landlord had installed on the leased premises. The court stated: "In this case we see no reason to distinguish between appliances which are attached to the realty, and appliances or furniture which are not." (Id. at p. 961, 128 Cal.Rptr. 69.)[12]Golden therefore implicitly concluded that the doctrine of strict products liability applies to appliances or other manufactured component products that are installed in buildings.
We conclude manufactured windows that are installed in a home remain products under the doctrine of strict products liability. Although manufactured windows are installed in and become components of the larger product, a home, they retain their status as products. Thus, under general strict products liability principles, if a defective manufactured component incorporated into a larger product, *596 including real estate, causes damage to a person or other property, the manufacturer of that component, and all others in the chain of distribution of that component, may be subject to strict products liability.

B
The application of the doctrine of strict products liability to a component manufacturer should not depend on the contractual arrangements for the installation of the component in a home. For example, if a homeowner purchases a defectively designed or manufactured window from a home improvement retail store and then installs it in his or her home as a replacement for an original window, the doctrine of strict products liability may be applied to the manufacturer of the defective window, any wholesaler in the chain of distribution, and the home improvement retail store. The result should not be different if that same defective window was distributed in a different manner and was installed in a new mass-produced home. In this case, Defendants' manufactured windows were designed for installation in homes. The fact that Defendants sold the windows to distributors that, in turn, sold the windows to subcontractors that installed the windows in mass-produced new homes should not alter the strict products liability of the manufacturer for any defective design or manufacture of those windows. The contractual arrangements of the parties in the chain of distribution of a defective product do not affect the strict products liability of a manufacturer or any other distributor of that product.
Furthermore, the existence of a strict products liability cause of action against the developer of a mass-produced home should not preclude the imposition of strict products liability on the manufacturer of a defective component that is installed in that home. Both the developer and component manufacturer may be held strictly liable for damages caused by the defective component. (Kriegler v. Eichler Homes, Inc., supra, 269 Cal.App.2d at pp. 227-229, 74 Cal.Rptr. 749; Bay Summit Community Assn. v. Shell Oil Co., supra, 51 Cal.App.4th at pp. 776-777, 59 Cal. Rptr.2d 322; Edwards v. A.L. Lease & Co., supra, 46 Cal.App.4th at pp. 1033-1034, 54 Cal.Rptr.2d 259; Rest.3d Torts, Products Liability, §§ 5, 19, com. e, p. 270.) As we noted ante, the Restatement Third of Torts, Products Liability, section 19, comment e, states: "[T]he builder, together with the equipment manufacturer and other distributors, are held as product sellers...." (Id. at p. 270.) Therefore, in this case, any strict products liability of McMillin should not preclude the imposition of strict products liability on Defendants for damages caused by any defect in the design or manufacture of their windows.

C
Cobb argues that the doctrine of strict products liability cannot apply in this case because it is undisputed that Cobb had no control of its windows after they left its possession. Cobb notes that its windows were stored and later installed by Minnoch or other parties in Plaintiffs' homes in accordance with McMillin's instructions. Minnoch's contract with McMillin provided that Cobb's windows and doors were to be installed in a "three-trip" process. During the first trip, Minnoch was to deliver and install the window frames, door frames and window sashes. During the second trip, Minnoch was to deliver and install the patio door panels. During the third trip, Minnoch was to deliver and install all screens. Because Cobb did not control delivery and installation of its windows, it argues it cannot be held strictly liable for damages caused by any defective windows; if its windows leaked because of improper installation or other acts or omissions in construction of Plaintiffs' homes, it should not be held strictly liable.
However, Cobb does not dispute that it controlled the design and manufacture *597 of its windows before they left its possession. Plaintiffs allege that Defendants' windows were defective at the time they left Defendants' possession and that those defects caused their damages. "As long as the [Plaintiffs] establish[ ] that the product was defective when it left the hands of a given seller in the distributive chain, [strict products] liability will attach...." (Rest.3d Torts, Products Liability, § 2, com. c, p. 18.) If Plaintiffs' allegations are proven at trial, Defendants should be held liable under general principles of strict products liability. The reporters for the Restatement Third of Torts, Products Liability, note that strict products liability applies in analogous circumstances: "The mere fact that the component part is shipped in a separate state and that it must be later assembled by the manufacturer or the end-user of the larger product[ ] does not relieve the component maker of strict liability. [Citations.] [¶] Furthermore, even a significant subsequent alteration of a component will not relieve a component part manufacturer of strict liability unless the change itself creates the defect that constitutes the proximate cause of injury. [Citations.]" (Rest.3d, supra, § 19, reporters' notes, p. 274.) To the extent Defendants show at trial that Plaintiffs' damages were caused by improper installation of Defendants' windows and not by defective design or manufacture of their windows, then under general principles of strict products liability Defendants should prevail.[13] However, Defendants did not show in their papers in support of their summary adjudication motions that there is no triable issue on causation and that they therefore are entitled to summary adjudication as a matter of law on Plaintiffs' cause of action for strict products liability. Triable issues of fact exist on causation and other material facts that preclude summary adjudication. Cobb's "no control" defense to strict products liability will apply if the trier of fact finds at trial that Plaintiffs' damages were caused entirely by improper installation of their windows or other negligent acts of other parties.[14] (Cf. Springmeyer v. Ford Motor Co., supra, 60 Cal.App.4th at pp. 1550-1555, 71 Cal.Rptr.2d 190.)

V

Purposes of Strict Products Liability
The purposes underlying the doctrine of strict products liability support the imposition of strict products liability on Defendants if at trial Plaintiffs show that Defendants' windows were defective when they left their possession and that the defects caused damage to other property. Greenman stated: "The purpose of [strict products] liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (Greenman v. Yuba Power Products, Inc., supra, 59 *598 Cal.2d at p. 63, 27 Cal.Rptr. 697, 377 P.2d 897.) In this case, imposition of strict products liability for damages caused by defective windows manufactured by Defendants would serve that purpose set forth in Greenman. Because Defendants designed and manufactured the windows installed in Plaintiffs' homes, Defendants should bear the costs of injuries suffered by consumers who are in a disadvantageous position to protect themselves from defectively designed or manufactured windows. Defendants are in the best position to guard against defective design or manufacture of their windows and therefore imposition of strict products liability on them is appropriate.
A related purpose of strict products liability is the promotion of product safety. (Greenman v. Yuba Power Products, Inc., supra, 59 Cal.2d at p. 63, 27 Cal.Rptr. 697, 377 P.2d 897; Vandermark v. Ford Motor Co., supra, 61 Cal.2d at p. 262, 37 Cal. Rptr. 896, 391 P.2d 168; Bay Summit Community Assn. v. Shell Oil Co., supra, 51 Cal.App.4th at pp. 772-773, 59 Cal. Rptr.2d 322.) Justice Traynor's concurring opinion in Escola v. Coca Cola Bottling Co. (1944) 24 Cal.2d 453, at page 462, 150 P.2d 436 (cited with approval in Greenman, supra, at p. 63, 27 Cal.Rptr. 697, 377 P.2d 897) stated: "[P]ublic policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market." By imposing strict products liability on Defendants, they will be encouraged to manufacture windows that are safer and/or have fewer defects.
Another purpose of strict products liability is to spread the cost of losses suffered by individuals from defective products. Justice Traynor's concurring opinion in Escola stated: "The cost of an injury and the loss of time or health may be an overwhelming misfortune to the person injured, and a needless one, for the risk of injury can be insured by the manufacturer and distributed among the public as a cost of doing business." (Escola v. Coca Cola Bottling Co., supra, 24 Cal.2d at p. 462, 150 P.2d 436) (cone. opn. of Traynor, J.) A manufacturer is in the best position to insure against losses suffered because of its defective products. It can self-insure or purchase insurance from a third party and then either (1) spread the cost of that insurance among all consumers by charging a proportionately higher price for its product, or (2) absorb the cost of that insurance and thereby reduce the profit it would otherwise make from the sale of its product. By imposing strict products liability on the manufacturer of a defective product, individual consumers will be less likely to have to bear the entire cost of losses suffered from that defective product and normally should be able to obtain full reparation for their losses.
Another purpose of strict products liability is to reduce the litigation costs incurred by a plaintiff and to ensure a defendant that places a defective product on the market does not escape liability by eliminating the requirement that the plaintiff show the defendant was negligent. The Restatement Third of Torts, Products Liability, section 2, comment a, at page 15 states: "[B]y eliminating the issue of manufacturer fault from plaintiffs case, strict liability reduces the transaction costs involved in litigating that issue. [¶] ... In many cases manufacturing defects are in fact caused by manufacturer negligence but plaintiffs have difficulty proving it. Strict liability therefore performs a function similar to the concept of res ipsa loquitur, allowing deserving plaintiffs to succeed notwithstanding what would otherwise be difficult or insuperable problems of proof." That purpose supports imposition of strict products liability in this case. Although Plaintiffs may be able to sustain their burden to show that the windows were defective when they left Defendants' possession, they could have difficulty in further showing Defendants were negligent. To eliminate the expense and possible difficulty in proving Defendants' negligence in this *599 case, the doctrine of strict products liability should apply.
We conclude that the purposes of imposing strict products liability support the application of the doctrine in this case.

VI

Casey and the Subcontractor Exception
Defendants contend the holding in Casey and the rationale of La Jolla Village Homeowners' Assn. v. Superior Court, supra, 212 Cal.App.3d 1131, 261 Cal.Rptr. 146 (La Jolla Village) preclude the application of strict products liability in this case. Defendants' position is that, based on Casey and La Jolla Village, strict products liability in the context of mass-produced housing is limited to the developer and does not apply to subcontractors, material suppliers or component manufacturers.

A
We discuss La Jolla Village first because it was cited as controlling precedent in Casey. In La Jolla Village, the trial court struck from the homeowners association's complaint a cause of action for strict products liability against all subcontractors "involved in `constructing and manufacturing'" a new condominium building. (La Jolla Village, supra, 212 Cal.App.3d at pp. 1136-1137, 261 Cal.Rptr. 146.) The cause of action for strict products liability against the condominium's developer was not struck. (Id. at pp. 1136-1138, 261 Cal.Rptr. 146.) In granting the subcontractors' motion to strike, the trial court stated: "`I don't believe the strict [products] liability [doctrine] extends to the subcontractors for performing services as opposed to [supplying] a component product.'" (Id. at p. 1138, 261 Cal. Rptr. 146, italics added.) The trial court explained: "`[T]here is no strict liability on the part of the subcontractors who furnished primarily services as opposed to a component part like a furnace or something of that nature.'" (Ibid., italics added.) The plaintiff homeowners association filed a petition for writ of mandate challenging the trial court's ruling. (Id. at p. 1139, 261 Cal.Rptr. 146.)
In denying the petition, we stated: "An overview of [strict products liability cases involving residential developers] reflects that the doctrine of strict liability has been applied to defendants who are characterized as mass producers, developers and sellers/lessors of real property developments and extended no further. No reported California case has held that a subcontractor hired by a developer can be held strictly liable for defects in a mass-produced housing project and we decline to do so now." (La Jolla Village, supra, 212 Cal.App.3d at p. 1144, 261 Cal. Rptr. 146, fn. omitted.) We noted: "In the typical general contractor/developer-subcontractor relationship, the general [contractor] is the principal in charge of the planning, designing, constructing, supervising, inspecting and then selling of the residential units. The general [contractor] hires subcontractors to carry out the planning, designing, and constructing of the units.... The subcontractor customarily performs one task which is integrated into a whole. It does not control the trades which precede or follow it on the job.... Hence the subcontractor does not have control over the whole `product' nor over its own `component part' except as to dealings with its own work within the limits placed on it by its contract with the general contractor. It does not typically construct a finished product to its own specifications (like a tire made for an automobile), but works to the plans of the developer." (Id. at pp. 1144-1145, 261 Cal.Rptr. 146.) We concluded: "[A] subcontractor who does not have any ownership or control over the project or over its portion of the project being built should not be held strictly liable for defective or dangerous conditions of the mass-produced homes." (Id. at p. 1145, 261 Cal.Rptr. 146.) We further concluded: "We decline to extend *600 the doctrine [of strict products liability] to persons who have no control over or financial interest in, other than for their own payment for services, the project or product being `manufactured.'" (Id. at p. 1146, 261 Cal.Rptr. 146, italics added.)
As support for our holding, we cited and summarized three cases[15] that "generally distinguished `subcontractors' from builders/developers as providers of services who were only liable for their own negligence or intentional acts," but we also observed "their reasoning conveys a broader reach to include all subcontractors in the typical real estate construction project regardless of whether they provided `services' or a `product.'" (La Jolla Village, supra, 212 Cal.App.3d at p. 1146, 261 Cal.Rptr. 146, italics added.) On further contemplation of this issue, we believe we overstated the reasoning and reach of the three cases we cited in La Jolla Village. None of the cases involved manufacturers of products installed in mass-produced homes. Rather, all three cases involved providers of services in the design or construction of real property projects. (Id. at pp. 1146-1147, 261 Cal.Rptr. 146.) Therefore, our statement that the reasoning of these cases extended "to include all subcontractors in the typical real estate construction project regardless of whether they provided `services' or a `product,'" was dictum to the extent it addressed the application of strict products liability to a "product." (Id. at p. 1146, 261 Cal.Rptr. 146.) Furthermore, we note that the facts in La Jolla Village involved subcontractors that provided only services in the construction of the condominium building and did not involve any subcontractors or material suppliers that manufactured or distributed a component product installed in the condominium building. Therefore, we conclude the suggestion in La Jolla Village that subcontractors that manufacture or distribute component products installed in a residential building are not subject to strict products liability was dictum.[16]
In La Jolla Village, we further noted a subcontractor that provided services could nevertheless be held strictly liable if it had a "special status or relationship" with respect to the construction project or its developer. (La Jolla Village, supra, 212 Cal.App.3d at p. 1147, 261 Cal.Rptr. 146.) We noted: "While a subcontractor may also be the developer of a project or be in a joint venture having a financial interest in and control of the project, if such a special status or relationship applies, the subcontractor would not really be a subcontractor, regardless of its providing services to the project, and it could conceivably be treated as part of the manufacturing link." (Ibid.) However, on consideration of the facts of that case, we concluded the plaintiff had not alleged that the subcontractors had such a special status or relationship. (Id. at pp. 1147-1149, 261 Cal.Rptr. 146.) Accordingly, we denied the petition and upheld the trial court's striking of the cause of action for strict products liability against the subcontractors that provided services in the construction of the condominium building. (Id. at p. 1152, 261 Cal.Rptr. 146.)
We conclude La Jolla Village is limited to cases involving subcontractors that provide services in the construction of a massproduced housing product. The instant case involves manufacturers of windows that are component part products installed in a larger, integrated mass-produced new home product. We perceive no reason that our analysis of the doctrine of strict products liability, as applied to component part manufacturers as set forth in parts *601 III and IV of this opinion, and the rationale for the doctrine of strict products liability as set forth in part V of this opinion, are not applicable to this case. Defendants manufactured and distributed products, not services, and are therefore subject to strict products liability. La Jolla Village does not apply to subcontractors that provide products, or to material suppliers or manufacturers of products.[17]

B
In Casey, homeowners filed a complaint alleging a cause of action for strict products liability against the developer of their homes and other parties. (Casey, supra, 74 Cal.App.4th at pp. 116-117, 87 Cal. Rptr.2d 603.) The homeowners settled their action with all of the defendants except Overhead Door Corp. (Overhead).[18] The complaint alleged Overhead designed and manufactured finished window products that were defective when it sold them to the developer that installed them in the homes. (Id. at p. 118, 87 Cal.Rptr.2d 603.) Overhead filed a motion for summary adjudication on the strict products liability cause of action against it. (Id. at p. 117, 87 Cal.Rptr.2d 603.) In support of its motion, Overhead lodged an agreement between it and the developer purporting to show Overhead "was a subcontractor providing materials, labor and equipment" for construction of the homes. (Id. at p. 119, 87 Cal.Rptr.2d 603.) The trial court granted Overhead's motion for summary adjudication.[19] (Id. at p. 117, 87 Cal.Rptr.2d 603.)
On appeal the Court of Appeal, Fourth Appellate District, Division Two, affirmed that part of the judgment granting Overhead's summary adjudication motion, concluding that La Jolla Village controlled its decision. (Casey, supra, 74 Cal.App.4th at pp. 118-120, 87 Cal.Rptr.2d 603.) The court recognized that developers of mass-produced homes could be held strictly liable, *602 but, citing La Jolla Village, noted that courts "have refused to extend the principle beyond the developer to the subcontractors or suppliers. [Citation.]" (Id. at p. 119, 87 Cal.Rptr.2d 603.) The court then quoted language from pages 1145 and 1146, 261 Cal.Rptr. 146 of La Jolla Village, including its dictum that subcontractors should not be held strictly liable "`regardless of whether they provided "services" or a "product."' [Citation.]" (Casey, supra, at p. 119, 87 Cal.Rptr.2d 603.) The court noted the exception to La Jolla Village's general rule when a subcontractor has a special relationship or financial interest in and control of the project. (Ibid.) The court concluded there was no evidence that Overhead had any special relationship. (Ibid.) Casey concluded: "[S]ince subcontractors are not strictly liable (La Jolla Village Homeowners' Assn. v. Superior Court, supra, 212 Cal.App.3d at p. 1145, 261 Cal.Rptr. 146), Overhead has met its burden of showing that plaintiff[s] cannot prevail against it on a cause of action for strict liability." (Casey, supra, at p. 119, 87 Cal.Rptr.2d 603.)
Casey rejected the homeowners' contention that La Jolla Village did not preclude Overhead's strict products liability as a manufacturer of defective products, including windows, window frames and window components. (Casey, supra, 74 Cal. App.4th at pp. 119-120, 87 Cal.Rptr.2d 603.) Casey reasoned: "[T]his is essentially a claim for a construction defect in a component part of a mass-produced home. Plaintiffs have presented no evidence to refute the fact that Overhead was a subcontractor and materials supplier to the project. Rather, they argue that because Overhead was also a manufacturer, La Jolla [Village] does not apply. [¶] La Jolla [Village] is not limited as plaintiffs suggest. The distinction is not between material or `service' suppliers (i.e., subcontractors), on the one hand and materials manufacturers on the other. Instead, the distinction is between the developer, which `manufactures' the homes, and the rest of the participants, regardless of whether they provide a service, supply a component or manufacture a component part." (Id. at pp. 119-120, 87 Cal.Rptr.2d 603.) It further observed that the risk-distribution purpose of the doctrine of strict products liability was met by holding the developer of the mass-produced homes strictly liable for all defects because the developer normally was in privity with the homeowners and could state an indemnity claim against the subcontractors and suppliers. (Id. at p. 120, 87 Cal.Rptr.2d 603.) Casey concluded: "[W]e find that La Jolla [Village] controls and Overhead is not liable to plaintiffs regardless of whether it is characterized as a manufacturer or supplier of materials or a subcontractor."[20] (Ibid.) Accordingly, the court concluded the trial court properly granted Overhead's motion for summary adjudication on the homeowners' cause of action for strict products liability. (Ibid.)
We disagree with Casey's reasoning and holding. Although Casey is similar factually to this case,[21] we reach a contrary conclusion based on our understanding of the general principles and rationale of the doctrine of strict products liability. Casey primarily relied on La Jolla Village as support for its holding. However, La Jolla Village involved subcontractors that provided services in the construction of a condominium building. *603 A manufacturer of windows provides products, not services. Although those products ultimately are installed in and become component parts of a residential building, their identity as products under the doctrine of strict products liability remains unchanged. Both the manufactured window component parts and the larger, integrated mass-produced residential building are products for purposes of strict products liability. (Rest.3d Torts, Products Liability, § 19, corns, b & e, pp. 268-271.) The designation of a manufacturer or other distributor as a subcontractor does not preclude application of the doctrine of strict products liability. It is the substance of the subcontractor's function, not its designated label, that normally determines whether it may be held strictly liable.[22] (Cf. Bay Summit Community Assn. v. Shell Oil Co., supra, 51 Cal.App.4th at p. 774, 59 Cal.Rptr.2d 322 ["[T]he courts have eschewed legal labels and have taken a very practical approach, focusing on the actual connection between the defendant's activities and the defective product ... [and] the defendant's legal status or formal relationship with the manufacturer or the consumer is not dispositive."].) As we concluded ante, a manufacturer of a defective product may be subject to strict products liability even if that product becomes a component part of a larger product, such as a mass-produced home. Defendants, and presumably Overhead, were manufacturers of component products. They controlled the design and manufacture of their windows. If a homeowner had purchased the manufactured windows from a retailer and installed them in his or her home as replacements for original windows, the windows would be considered products under the doctrine of strict products liability. A manufacturer's windows should not be classified or treated differently under the doctrine of strict products liability merely because they were purchased by a subcontractor that then installed them in massproduced new homes; the window remains a product despite its ultimate integration into a larger product. Furthermore, we disagree with Casey's conclusion (Casey, supra, 74 Cal.App.4th at pp. 119-120, 87 Cal.Rptr.2d 603), that a manufacturer's strict liability for a defective component product is precluded because the developer of mass-produced new homes is strictly liable for defects in those homes. Strict products liability attaches to all persons in the chain of distribution of a defective product, including manufacturers, wholesalers, suppliers and retailers. The imposition of strict products liability on one link in that chain does not absolve other links from strict products liability. We conclude the manufacturer of a defective window and all distributors of that window, including a developer that integrates that defective window into a mass-produced home, are strictly liable for damage to persons or other property caused by that defective window.[23]

*604 C
We note the facts in this case are similar to those in Bay Summit, which involved a defective polybutylene plumbing system installed by a developer's plumbing subcontractor in a condominium project. (Bay Summit Community Assn. v. Shell Oil Co., supra, 51 Cal.App.4th at pp. 766-768, 59 Cal.Rptr.2d 322.) Both the manufacturer of the defective plumbing system (United States Brass Corporation) and the supplier of a nondefective resin product used in manufacturing the plumbing system (Shell Oil Co.), were found strictly liable by the jury. (Id. at pp. 766-767, 59 Cal.Rptr.2d 322.) Shell Oil Co. appealed, arguing it could not be strictly liable for its nondefective resin component product. (Id. at p. 767, 59 Cal.Rptr.2d 322.) Although we reversed the judgment on instructional error grounds, we concluded Shell Oil Co. was potentially subject to strict products liability because of its significant participation in the marketing and distribution of the defective plumbing system even though it was "outside the vertical distribution chain" of the defective plumbing system. (Id. at pp. 767, 776-777, 59 Cal.Rptr.2d 322.) In Bay Summit, we therefore implicitly concluded that manufacturers, parties in the direct chain of distribution, and parties that are sufficiently involved in the marketing and distribution of defective component products installed in mass-produced homes may be subject to strict products liability. (See also Edwards v. A.L. Lease & Co., supra, 46 Cal.App.4th 1029, 54 Cal.Rptr.2d 259.)
We believe Defendants in this case fall within the range of potential strict products liability defendants that we recognized in Bay Summit. In this case, component windows were installed in mass-produced residences. In Bay Summit, component plumbing systems were installed in mass-produced residences. If Shell Oil Co., as a marketer of defective plumbing systems, can be held strictly liable, then Defendants, as manufacturers of allegedly defective windows, can be held strictly liable. Therefore, our reasoning and holding in Bay Summit supports our conclusion in this case. We perceive no reason to except Defendants from application of the general principle of strict products liability.

VII

Conclusion
Because Defendants did not show that they cannot be held strictly liable based on the undisputed facts set forth in their moving papers, the trial court erred by granting Defendants' motions for summary adjudication on Plaintiffs' cause of action for strict products liability. Triable issues of material fact exist whether Defendants' windows were defective when they left Defendants' possession and whether the defects caused damage to persons or other property.[24]

DISPOSITION
Let a peremptory writ of mandate issue directing the superior court to vacate its orders granting Defendants' motions for summary adjudication and enter a new order denying the motions. Plaintiffs are entitled to costs incurred in this writ proceeding.
BENKE, Acting P.J., and NARES, J., concur.
NOTES
[1] For convenience we will refer to the parties by their trial court designations.
[2] Although the record is unclear regarding the role of Medallion Industries, Inc. (Medallion) in the Galleria and Renaissance subdivisions, Plaintiffs alleged that it, together with Cobb, Viking and Minnoch, "were each responsible for the design, development, manufacturing and placing into the stream of commerce all of the windows found to exist in" the Galleria and Renaissance homes. Medallion apparently was a distributor of Viking's windows.
[3] The record does not support Defendants' assertion that Plaintiffs previously received relief for damages caused by Defendants' allegedly defective products as a result of a prior, separate action filed against McMillin,
[4] We granted the request of Premier Window Products Corporation and Guaranteed Products Corporation to file an amicus curiae brief and have reviewed that brief in considering the petition.
[5] All statutory references are to the Code of Civil Procedure unless otherwise specified.
[6] Although strict products liability generally may apply to a manufacturer of a unique product that is not mass-produced (Wright v. Stang Manufacturing Co. (1997) 54 Cal. App.4th 1218, 1229, 63 Cal.Rptr.2d 422), we concluded in Oliver v. Superior Court (1989) 211 Cal.App.3d 86, at page 89, 259 Cal.Rptr. 160, that the doctrine of strict products liability does not apply to "the occasional construction and sale of residences."
[7] Strict products liability may be imposed if: (1) there was a defect or flaw in the manufacturing process that resulted in a product that differed from the manufacturer's intended result; (2) there was a defect in the design of the product; or (3) the product is dangerous or otherwise defective because it lacked adequate warnings or instructions. (Brown v. Superior Court (1988) 44 Cal.3d 1049, 1057, 245 Cal.Rptr. 412, 751 P.2d 470.)
[8] We noted: "On the other hand, a service is no more than direct human action or human performance.... In light of the infinite subtle nuances of human performance, the law reasonably imposes only a standard of negligence rather than strict liability in the provision of human services." (Pierson v. Sharp Memorial Hospital, Inc., supra, 216 Cal. App.3d at p. 345, 264 Cal.Rptr. 673, italics added.)
[9] The Restatement Third, supra, section 19 further provides: "(b) Services, even when provided commercially, are not products. [¶] (c) Human blood and human tissue, even when provided commercially, are not subject to the rules of this Restatement."
[10] Wright noted: "Appellants in their opening brief appear to concede the fact that the deck gun was manufactured in accordance with the requests of the Glendale Fire Department, although there was no evidence on the issue either way offered by the parties below. We thus cannot determine whether the deck gun in question was mass produced, or a special piece of equipment made in accordance with the purchaser's plans. In any event, the uniqueness of a purchaser's order does not alter the manufacturer's responsibilities and is not a defense [to a strict products liability cause of action]. [Citation.]" (Wright v. Stang Manufacturing Co., supra, 54 Cal. App.4th at p. 1229, 63 Cal.Rptr.2d 422.)
[11] However, the court did not decide the issue of strict products liability of landlords and hotel owners that participate in the construction of their buildings or otherwise create a defective product that causes injury. (Peterson v. Superior Court, supra, 10 Cal.4th at p. 1200, 43 Cal.Rptr.2d 836, 899 P.2d 905.) It nevertheless commented in dictum that "in such circumstances strict liability would attach, if at all, based upon the landlord's status as a builder who is engaged in the business of constructing (i.e., manufacturing) rental properties. [Citations.]" (Ibid.)
[12] Golden stated: "We conclude that a lessor of real property who, as the landlord in this case, is engaged in the business of leasing apartments and appurtenant commercial premises, equips the premises with an appliance without knowing whether or not it is defective because of the manner in which it was manufactured or installed, and it proves to have defects which cause injury to persons or property when used in a normal manner, is strictly liable in tort." (Golden v. Conway, supra, 55 Cal.App.3d at pp. 961-962, 128 Cal. Rptr. 69.) That conclusion, however, may have been limited by the California Supreme Court's subsequent opinion in Peterson v. Superior Court, supra, 10 Cal.4th 1185, 43 Cal. Rptr.2d 836, 899 P.2d 905, discussed ante. Regardless of the continuing validity of Golden's conclusion on a landlord's strict products liability, we believe its observation on the lack of a distinction between appliances attached to realty and appliances not attached to realty continues to be persuasive in strict products liability cases.
[13] Alternatively, to the extent Defendants' defective windows were not the sole cause of Plaintiffs' damages, Defendants may be liable for only part of those damages under comparative fault principles or Defendants may have a cause of action for equitable indemnity against others who negligently installed their windows in Plaintiffs' homes. (Bay Summit Community Assn. v. Shell Oil Co., supra, 51 Cal.App.4th at p. 777, 59 Cal. Rptr.2d 322; Safeway Stores, Inc. v. Nest-Kart (1978) 21 Cal.3d 322, 330, 146 Cal.Rptr. 550, 579 P.2d 441 ["Nothing in the rationale of strict product liability conflicts with a rule which apportions liability between a strictly liable defendant and other responsible tortfeasors. Although one of the principle social policies served by product liability doctrine is to assign liability to a party who possesses the ability to distribute losses over an appropriate segment of society [citation], this policy has never been viewed as so absolute as to require, or indeed as to permit, negligent tortfeasors who have also contributed to the injury to escape all liability whatsoever."].)
[14] Cobb's having no control over the mass production of Plaintiffs' homes does not preclude its strict products liability for a defective product (e.g., a manufactured window) that is a component part of a larger product (e.g., a mass-produced home). (Rest.3d, supra, § 19, corns, b & e, pp. 268-271.)
[15] The three cases that we cited and summarized were: Gagne v. Bertran (1954) 43 Cal.2d 481, 275 P.2d 15; Stuart v. Crestview Mut. Water Co. (1973) 34 Cal.App.3d 802, 110 Cal. Rptr. 543; and Swett v. Gribaldo, Jones & Associates (1974) 40 Cal.App.3d 573, 115 Cal. Rptr. 99.
[16] Monte Vista Development Corp. v. Superior Court (1991) 226 Cal.App.3d 1681, 1686, 277 Cal.Rptr. 608, reviewed the same language in La Jolla Village and reached the same conclusion as this opinion.
[17] We further note the subcontractors in La Jolla Village had a direct contractual relationship with the developer of the condominium building. In this case, Defendants did not have a contractual relationship with the developer of the new homes. Defendants were manufacturers that sold their manufactured windows to a distributor and a subcontractor that apparently had contractual relationships with the developer.

Furthermore, Defendants do not fall within the usual meaning of the term "subcontractor." Rather, as suppliers of component products that were installed in the new homes, Defendants under California mechanics' lien statutes probably would be considered, at most, materialmen and, more likely, merely suppliers to materialmen. (Civ.Code, § 3090; Vaughn Materials Co. v. Security Pacific National Bank (1985) 170 Cal.App.3d 908, 912-913, 918, 216 Cal.Rptr. 605; Roe-Ming s S. Co. v. Humboldt etc. Co. (1896) 112 Cal. 288, 290-291, 44 P. 568; Cal. Mechanics' Liens and Related Construction Remedies (Cont.Ed.Bar 3d ed.1998) § 2.13, pp. 36-37.) A materialman is "any person who furnishes materials or supplies to be used or consumed in any work of improvement." (Civ.Code, § 3090.) In contrast, a subcontractor performs some portion of the work of improvement. (Vaughn Materials Co., supra, at pp. 913, 918, 216 Cal.Rptr. 605; Theisen v. County of Los Angeles (1960) 54 Cal.2d 170, 183, 5 Cal.Rptr. 161, 352 P.2d 529.) Defendants did not perform any of the construction work for McMillin, so they do not qualify as subcontractors for lien purposes. Even had they performed construction services, Defendants' independent acts in manufacturing the windows would control and subject them to strict products liability for the defective windows they manufactured.
Also, even had Defendants been labeled subcontractors in a contract with Minnoch, Medallion or others, the substance of the transactions and Defendants' actions, rather than their form or given labels, determine whether the doctrine of strict products liability applies. (Bay Summit Community Assn. v. Shell Oil Co., supra, 51 Cal.App.4th at p. 774, 59 Cal.Rptr.2d 322["[T]he defendant's legal status or formal relationship with the manufacturer or the consumer is not dispositive."].)
[18] Overhead Door Corp. was the successor in interest to Premier Products, Inc., which was originally named as a defendant. (Casey, supra, 74 Cal.App.4th at p. 116, fn. 1, 87 Cal. Rptr.2d 603.)
[19] The trial court subsequently granted Overhead's nonsuit motion on the remaining cause of action for indemnity and entered judgment for Overhead. (Casey, supra, 74 Cal.App.4th at pp. 117-118, 87 Cal.Rptr.2d 603.)
[20] Casey also expressed its disagreement with Monte Vista's disagreement with La Jolla Village's language that all subcontractors, whether suppliers of services or products, were exempt from strict liability. (Casey, supra, 74 Cal.App.4th at p. 120, 87 Cal.Rptr.2d 603.) Interestingly, Casey recognized that Monte Vista's disagreement with La Jolla Village's language regarding suppliers of products was dictum, but Casey did not recognize that La Jolla Village's underlying language on that issue was also dictum. (Id. at p. 120, fn. 4, 87 Cal.Rptr.2d 603.)
[21] One difference is that Overhead had a direct contractual relationship with the developer, and Defendants did not have a contractual relationship with McMillin.
[22] As we noted in La Jolla Village, a subcontractor also can be held strictly liable if it has a special status or relationship showing it had a financial interest in or control over the development project other than as a subcontractor providing only services. (La Jolla Village, supra, 212 Cal.App.3d at p. 1147, 261 Cal.Rptr. 146.)
[23] Unlike Fieldstone Co. v. Briggs Plumbing Products, Inc. (1997) 54 Cal.App.4th 357, 62 Cal.Rptr.2d 701, the complaint in this case alleged the defective product caused damage to other property. (Cf. Stearman v. Centex Homes (2000) 78 Cal.App.4th 611, 615, 622-623, 92 Cal.Rptr.2d 761.) In Fieldstone, the developer filed an action against the manufacturer of defective bathroom sinks installed in the developer's mass-produced residences. (Fieldstone, supra, at p. 362, 62 Cal.Rptr.2d 701.) However, the only damage alleged was to the defective sinks, which the developer replaced. (Ibid.) The Court of Appeal affirmed summary judgment for the manufacturer in part because the manufacturer could not be held strictly liable for economic damages only (i.e., damage only to the defective product). (Id. at pp. 366-367, 62 Cal.Rptr.2d 701.) The developer did not allege any damage to other property. (Id. at p. 366, 62 Cal.Rptr.2d 701.) In this case, the economic loss rule does not preclude Plaintiffs' cause of action for strict products liability because they alleged damage to property other than the allegedly defective windows. (Stearman, supra, at pp. 622-623, 92 Cal.Rptr.2d 761.)
[24] We reject Defendants' assertion that writ relief is unwarranted because, despite the trial court's summary adjudication, Plaintiffs retained a negligence cause of action against Defendants. As noted ante, one of the purposes of strict products liability is to avoid the cost and difficulty of showing that a product manufacturer was negligent by acting below the applicable standard of care.